MATHEWS v. THE ST. LOUIS & SAN FRANCISCO RAILWAY COMPANY, *Appellant.*

In Banc, March 24, 1894.

1. **Constitution:** RAILROAD: FIRES: STATUTE. The act of the legislature of 1887 (Laws, p. 101; *Ibid.,* Revised Statutes, 1889, sec. 2615) making a railroad company absolutely liable for damage to property from fires communicated by its locomotive is not unconstitutional as impairing, by subjecting it to an increased burden, the rights given it by its previously granted charter to propel its cars by steam.

2. ——: ——: ——: ——. Such law is not unconstitutional as denying to the company the equal protection of the laws.

3. ——: ——: ——: ——. Nor is it unconstitutional on the ground that it deprives the company of its property without due process of law.

4. ——: ——: ——: NEGLIGENCE. The liability under the statute for the injury resulting from fire being an absolute one, proof of diligence and care on the part of the railroad does not relieve it from liability.

5. ——: ——: ——: INSURANCE. Where the statute making a railroad company liable for injuries to property caused by its locomotives setting fire thereto gives them an insurable interest in property along their routes, it is no defense in an action for destruction of trees, shrubs and plants that their insurance was impracticable, and evidence in support of such defense is properly excluded.

6. ——: ——: ——: CONTRIBUTORY NEGLIGENCE. The fact that plaintiff permitted weeds to remain on his land adjoining the company's right of way after they had become dried does not show such contributory negligence as will defeat or lessen his recovery in such action.

7. ——: ——: ——: NEGLIGENCE. Where a statute makes a railroad company an insurer against fires communicated to property by its locomotives, no negligence short of fraud will bar a property owner's right to recover for loss arising from such fires.

8. Railroad: FIRES: STATUTE: DAMAGES. Although a statute makes railroad companies liable for fires communicated to property by their locomotives and gives them an insurable interest in property along their routes, a company which has not so insured is not entitled, in an action against it for damages arising from such fire, to an abatement to the amount the property owner has received on his own insurance.

9. ——: ——: ——: ——. Nor is it a defense to such action that in the condemnation proceeding brought by the railroad for a right of way through plaintiff's land, he claimed and was allowed compensation for damages from "fire for all time to come."

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

AFFIRMED.

*E. D. Kenna* for appellant.

(1) Section 2615 of the Revised Statutes of 1889 is unconstitutional, because: *First.* It impairs the obligation of the contract contained in defendant's charter. R. S. 1889, sec. 2543; *Fletcher v. Peck*, 6 Cranch, 87; *Dartmouth College v. Woodward*, 4 Wheat. 518; *U. S. v. Quincy*, 4 Wall. 535; *Greene v. Biddle*, 8 Wheat. 92; *Planter's Bank v. Sharp*, 6 How. 327; *Commissioners v. Trans. Co.*, 107 Pa. St. 112; *Railroad v. Railroad*, 60 Md. 263; *Bank v. Hamilton*, 21 Ill. 53; *Payne v. Baldwin*, 3 S. & M. 661; *Edwards v. Kearsey*, 96 U. S. 607; *Howard v. Bugbin*, 24 How. 461; *Meriwether v. Garrett*, 102 U. S. 472; *Bronson v. Kinzey*, 1 How. 311; *McCracken v. Hayward*, 2 How. 608; *Louisiana v. N. O.*, 102 U. S. 203; *Gas Co. v. Gas Co.*, 115 U. S. 668;

*Waterworks Co. v. Rivers*, 115 U. S. 82; *People v. Road Co.*, 9 Mich. 285; *Sloan v. Railroad*, 61 Mo. 24; *Smith v. Railroad*, 37 Mo. 295; Wharton on Negligence, sec. 668. *Second.* It denies defendant the equal protection of the laws. *Pierson v. Portland*, 69 Me. 269; *State v. Hays*, 81 Mo. 586; *Railroad v. Moss*, 60 Miss. 641; *Slaughterhouse Cases*, 16 Wall. 336; *Railroad Tax Case*, 13 Fed. Rep. 722; *Santa Clara County v. Railroad*, 118 U. S. 394. *Third.* It takes defendant's property without due process of law. *Railroad v. Lackey*, 78 Ill. 57; *Small v. Railroad*, 51 Iowa, 340; *Zeigler v. Railroad*, 58 Ala. 594; *Miller v. Martin*, 16 Mo. 508; *Khale v. Hobin*, 30 Mo. App. 476; *Catron v. Nichols*, 81 Mo. 82; *Wally's Heirs*, 2 Yerg. 554. (2) Said section, if valid, only makes the fact of the injury *prima facie* evidence of negligence. *Small v. Railroad, supra; Dill v. Railroad*, 32 Am. and Eng. R. R. Cases, 324; *Khale v. Hobin, supra; Catron v. Nichols, supra.* (3) Said section does not authorize damages for property upon which plaintiff could not have obtained insurance. *Chapman v. Railroad*, 37 Me. 92. (4) Plaintiff was not entitled to damages for his personal property. *Chapman v. Railroad, supra.* (5) The question of plaintiff's contributory negligence should have been submitted to the jury. *Ross v. Railroad*, 6 Allen, 92. (6) Plaintiff was compensated for his loss in the condemnation proceedings instituted by the defendant. *Small v. Railroad, supra.* (7) The defendant should have been allowed to prove the amount of insurance which plaintiff had upon his buildings at the time they were destroyed.

*J. G. Chandler*, for respondent.

(1) Section 2615, Revised Statutes, 1889, is constitutional. *Grissell v. Railroad*, 9 Atl. Rep. 137; *Rail-*

*road v. De Busk*, 20 Pac. Rep. 752; *Rodemacher v. M. & St. Paul Railroad*, 41 Iowa, 297; *Jones v. Railroad*, L. R. 3 Q. B. 733; *Hooksett v. Railroad*, 38 N. H. 242; *Lyman v. Railroad*, 4 Cush. 288; *Hart v. Railroad*, 13 Metc. 105; *Ross v. Railroad*, 6 Allen, 90; *Chapman v. Railroad*, 37 Me. 92; *Pratt v. Railroad*, 42 Me. 579; *Pierce v. Railroad*, 105 Mass. 199. (2) Appellant's charter, while authorizing the use of steam as a motive power, in no way exonerates it from liability to others for damages occasioned by its use. If it did, it would be unconstitutional and void. R. S. 1889; sec. 2543; Const., art. 12, secs. 5, 14. (3) The owner of land adjoining a railroad is not chargeable with contributory negligence for allowing dry grass and other combustible material to be on his premises. *Palmer v. Railroad*, 76 Mo. 217; *Patton v. Railroad*, 87 Mo. 117; 2 Wood's R'y Law, sec. 326, note 1, and sec. 330; *Railroad v. Schultz*, 93 Pa. St. 341; *Railroad v. Medley*, 75 Va. 449; *Railroad v. Hixon*, 79 Ind. 111; *Railroad v. Jones*, 86 Ind. 496. (4) Wrongdoers can have no benefit from payment by the insurer. May on Insurance, sec. 455; *Harding v. Townsend*, 43 Vt. 536; *Monticello v. Mollison*, 17 Howard (U. S.), 152; *Carroll v. Mo. Pac. Railroad*, 88 Mo. 239; *Hammond v. Schiff*, 6 S. E. Rep. (N. C.) 753; *Hart v. Railroad*, 13 Metc. 105; *Ross v. Railroad*, 6 Allen, 90.

GANTT, J.—This is an action for damages caused by the destruction and injury to plaintiff's property, a suburban residence and grounds, near the city of St. Louis, in St. Louis county, by fire alleged to have been set out by an engine, operated by the defendant on its railroad.

The petition contains two counts, the first being an action at common law, charging "that on the ninth day of August, 1887, and for a long time prior thereto,

defendant negligently suffered a large amount of dry grass, weeds, and rubbish to accumulate and remain upon and along its railway and right of way adjoining the land of the plaintiff, and used and employed in operating said railway, locomotive engines and other machinery, that were improperly and negligently constructed so that sparks of fire could and did needlessly escape said engines," and that by reason of such negligence fire was communicated to said dry grass, weeds and rubbish and extended to plaintiff's land and destroyed a dwelling house, barn, outbuildings, personal property therein, trees, and shrubbery of the value of $30,000, for which judgment is prayed.

The second count is based upon the statute (R. S. 1889, sec. 2615), and charges that the defendant owned and operated a railroad adjoining plaintiff's land, "having locomotive engines in use on the same and on said ninth day of August, 1887, fire was communicated from a locomotive engine, then in use upon said railroad owned and operated by defendant as aforesaid, to plaintiff's property on his said land" and then avers the destruction of the same property, of the same value as charged in the first count, and avers damages in, and prays judgment for, the same amount.

The answer admits the incorporation of defendant and the operation of the line of railway described in the petition, and the use of locomotive engines thereon and denies generally every other allegation in the petition; and then, as *special defenses* to each count of the petition, avers:

"1. That plaintiff has assigned to persons to this defendant unknown his right of action against this defendant, if any he ever had, and is neither a necessary or proper party plaintiff herein and is not the real party in interest, and is not, therefore, entitled to maintain or prosecute this action.

"2. That there is a defect of plaintiff in this, to wit: That the Detroit Fire and Marine Insurance Company, the Commercial Union Insurance Company, and the Imperial Fire Insurance Company, and each and every one of them are parties in interest in this case, and are necessary parties plaintiff herein.

"3. That on the date and at the time in the petition mentioned there was growing and standing upon the property in said petition described adjacent to and continuous from the right of way of defendant to the house, shrubbery and trees of plaintiff, in his petition described, large quantities of dry grass, leaves, weeds and other combustible and highly inflammable matter which were carelessly and negligently allowed to grow and accumulate upon said premises by and with the knowledge and consent of plaintiff. That the accumulation of dry combustible and highly inflammable matter as aforesaid had been carelessly and negligently allowed to remain upon said premises for a long time previous to the ninth day of August, 1887, to wit, for many years. That it was gross negligence for plaintiff to allow said dry and combustible matter to accumulate and remain upon his said premises without taking precautions to prevent the spread of fire which might accidentally be set upon the right of way of defendant railway company, or which might accidentally escape from passing engines, which said negligence of plaintiff did proximately and directly contribute to the injuries of which he complains.

" 4. That the said dwelling house, barn and outbuildings in the petition described were, on the ninth day of August, 1887, insured in certain insurance companies named in the answer for the aggregate sum of $10,000, which, as defendant avers, was greatly in excess of the real value of said dwelling house, barn and outbuildings. That said insurance companies after

the fire in plaintiff's petition alleged, paid to said plaintiff the sum of $10,000 on account of the loss sustained by reason of the burning of said dwelling house, barn and outbuildings, as aforesaid. Wherefore, defendant says that the sum so paid by the said insurance companies as aforesaid, should be applied *pro tanto* to the satisfaction of plaintiff's claim, if any he has, which defendant denies."

And the answer, in addition to the above counts, which are common to both counts of the petition, contains the following counts which are addressed to the second count of the petition only:

"5. Defendant avers that the alleged cause of action set forth in the second count of the petition is founded on an act of the legislature of the state of Missouri, entitled 'An act to establish the responsibilities of railroad companies and persons owning or operating railroads for damages by fire communicated by locomotive engines,' approved March 31, 1887, which act defendant avers is illegal, unconstitutional and void, in that it seeks to deprive the defendant of its property without due process of law, and is contrary to the provisions of section 30, article 2, of the constitution of the state of Missouri.

"6. That the said act of the legislature is illegal, unconstitutional and void, in that it denies the defendant the equal protection of the law, contrary to the provisions of section 1, article 14 of the amendments to the constitution of the United States; and in this, that it deprives defendant of its property without due process of law, contrary to the provisions of article 5, of the amendments to the constitution of the United States; and in this, that it impairs the obligations of a contract made between the State of Missouri and defendant by the terms of which it was impliedly agreed that said defendant might and could use fire for

the purpose of generating steam to propel locomotive engines and cars attached thereto and be responsible only for the negligent and careless use thereof, and is contrary to the provisions of article 1, section 10, of the constitution of the United States.

"7. That heretofore, to wit, on the first day of June, A. D. 1882, the plaintiff was the owner of the land, described in his petition and also of a certain strip of land along and adjacent to the west side of said tract one hundred feet wide, being the same strip of land now occupied by defendant's roadbed and right of way, and that defendant was desirous of building its road upon said strip. That plaintiff and defendant could not agree as to the amount of compensation to be paid to plaintiff for said strip, and defendant commenced proceedings in the circuit court of St. Louis county against plaintiff, the object and nature of which was to condemn a right of way upon said strip and through and along plaintiff's said land. That commissioners were duly appointed by said circuit court of St. Louis county before whom the matter of compensation of plaintiff was to be heard and before whom was then and there pending among other things the question of how much compensation plaintiff should receive from defendant: *First*, for actual amount of ground taken; *second*, for the injury to the property as a place of residence caused by running the road where it now runs; *third*, for cutting up or dividing the property then owned by plaintiff into detached portions; *fourth*, for danger of fire for all time to come.

"That thereafter, to wit, on the first day of July, A. D. 1882, the said matters so pending before said commissioners were all compromised and settled between plaintiff and defendant upon the agreement

that in consideration of all of said matters the defend-
ant should pay plaintiff the sum of $9,000 in full
payment, settlement, accord and satisfaction of said
right of way and said strip of land and all the matters
and things so pending before said commissioners as
aforesaid. That thereafter, to wit, on the fifteenth day
of July, A. D. 1882, defendant for the consideration
aforesaid paid to said Leonard Mathews, and said
Leonard Mathews received from the defendant the
said sum of $9,000 pursuant to and in compliance with
said contract and agreement. Wherefore defendant
says the plaintiff ought not to prosecute or maintain
said cause of action in said second count set out.''

The replication was a general denial of all new
matter set up in the answer.

Upon the trial and when the plaintiff first offered
testimony in his behalf, the defendant objected to the
introduction of any testimony for the reasons: *First,*
that the petition does not state a cause of action;
*second,* that in the first count plaintiff has not specific-
ally pleaded; *third,* that he has combined two causes
of action in one count, involving different rules of
evidence and different measures of damage; *fourth,*
that the law on which the second count is based is
unconstitutional.

These objections were overruled and exceptions
duly saved by defendant, and thereupon defendant
moved the court to require plaintiff to elect between
the two counts in his petition: Because the measure
of damages in the alleged causes of action set forth in
said petition are totally different, and because a differ-
ent and not the same proof is required to support each
of the said alleged causes of action. This motion was by
the court overruled and exception duly saved by
defendant.

The testimony on the part of plaintiff tended to

show that the plaintiff was the owner of a piece of real estate, lying between the Pacific railroad on the north and the St. Louis & San Francisco railway on the south, Holmes avenue on the west and the property of Anderson on the east; the northern part of this tract, containing about eleven and one-half acres, and lying between the Pacific railroad and Elliott avenue, was called the "Home Place," and was bounded by Osage orange hedges on the south, east and west. This "Home Place" had been improved and planted on plans prepared by a landscape gardener, and contained a large assortment of all kinds of ornamental trees, shrubbery and plants, as well as fruit trees and vines. There was on it a large dwelling of nineteen rooms; the front or main building made of concrete, and the rear building of frame in imitation of stone; also a large barn of seventy-five feet in length by thirty feet in width, with a bowling alley therein, and a cow shed attachment. There was also one or more outbuildings of no very considerable value, and in the house, barn and bowling alley, some personal property to the amount of probably two or three hundred dollars in value. As is generally the case, the testimony as to the value of this house and barn, and of the property as a whole with its improvements by painting, etc., was conflicting—plaintiff's witnesses putting the value of the house and barn alone as high as $18,000 and the value of the shrubbery, etc., destroyed, as high as $6,000.

On the afternoon of August 9, 1887, at a time when everything was very dry, a fire started along the railroad track and on the railroad right of way adjoining plaintiff's property, and at a point southeast of the barn, and was carried by a south or southeast wind with great rapidity into plaintiff's property, set fire to the barn and then to the house and outbuildings, and ran pretty much over the whole place, destroying the

buildings and much the larger part of the trees, plants, shrubbery, vines, etc.

Albert B. Chandler testified: He was at home, south of the railroad opposite Mr. Mathews' place on the day of the fire. It started near where Elliott avenue crosses the railroad, and swept up the railroad bank there and caught the Mathews' barn and burned it down, and the shingles flew from the barn and burned the house; after the fire he went down and saw ashes on the track, and saw where the fire had burned up the bank. He stirred the ashes and there were a few coals. When he first observed the fire it was going up the railroad bank.

Samuel K. Harding testified that on the ninth day of August, 1887, he was a brakeman in the employ of the defendant, and on that day was braking on a train which was called the "Hoodlum," and which passed plaintiff's place about 2 o'clock in the afternoon, and when it passed there he was on the rear part of the train and saw some grass on fire on the defendant's right of way opposite the Mathews' place, about six or eight feet from the ends of the ties on the bank in the cut. This fire was about three feet across. The engine gave out a great many sparks; he had noticed before that it gave out sparks. He had been running on that train since the first of August.

The place was occupied by plaintiff as a residence up to 1880, when he removed to St. Louis, leaving a man named Cleary in charge of the place. Cleary lived in the back part of the house and took care of the place till 1883, when it was rented to a Mr. Wright who lived there until September, 1884, from which time until the fire the place was vacant except that some member of plaintiff's family would go out once in a while and sometimes stay all night and sometimes a week or two. After the fire plaintiff sold the place for $9,000.

There was a verdict and judgment for plaintiff for $11,000. In due time, motions for new trial and in arrest of judgment were filed, heard and overruled, and defendant appealed to this court.

I. Among the grounds assigned for the reversal of the judgment of the circuit court, is the unconstitutionality of section 2615 of the Revised Statutes of 1889, Laws of 1887, page 101, which is as follows: "Each railroad corporation owning or operating a railroad in this state shall be responsible in damages to every person and corporation whose property may be injured or destroyed by fire communicated directly or indirectly by locomotive engines in use upon the railroad owned or operated by such railroad corporation, and each such railroad corporation shall have an insurable interest in the property upon the route of the railroad owned or operated by it, and may procure insurance thereon in its own behalf for its protection against such damages."

It is urged by counsel that this act is unconstitutional for three reasons: "It impairs the obligation of a contract." "It deprives defendant of its property without due process of law." "It denies to defendant the equal protection of the laws."

The defendant is a railroad corporation, organized under the general laws of this state, on the tenth of September, 1876, and prior to the passage of section 2615. The contention of the defendant raises a question of prime importance and has received our most careful consideration. Does the section, 2615, impair the obligation of the contract made by the state, in the grant of defendant's charter?

The claim is that it interferes with the right of defendant, granted in the sixth paragraph of section 2543, Revised Statutes, 1889, to propel its cars by steam, in subjecting it to an increased burden or

liability for fires set out by its locomotives. Said paragraph is as follows: "*Sixth*, to take and convey persons and property on their railroad by the power or force of steam or of animals, or by any mechanical power, and to receive compensation therefor." Defendant insists that because there was no statute in force at the time it was organized which would render it liable for damages by fire in the absence of proof or presumption that it had been guilty of negligence in the operation of its trains, the construction of its engines or the care of its right of way, and because the decisions of this court prior to the adoption of this section had never held it liable in such cases, save for negligence, that the law on this subject as then understood became part of its charter, and hence inviolable under the constitution of the United States.

It is wholly unnecessary to review the decisions which sustain the view adopted in the *Dartmouth College case*, that defendant's charter is a contract between it and the state. It has been uniformly followed by this court.

This ground has been gone over so often, and this limitation so thoroughly discussed that nothing new can be said on the subject. Says Judge COOLEY, in his great work on Constitutional Limitations, chapter 16, pages 707–710 [6 Ed.]: "The occasions to consider this subject in its bearings upon the clause of the constitution of the United States which forbids the states passing any laws impairing the obligation of contracts have been frequent and varied; and it has been held without dissent that this clause does not so far remove from state control the rights and properties which depend for their existence or enforcement upon contracts, as to relieve them from the operation of such general regulations for the good government of the state and the protection of the rights of individuals as

may be deemed important. All contracts and all rights, it is declared, are subject to this power; and not only may regulations which affect them be established by the state, but all such regulations must be subject to change from time to time, as the general well-being of the community may require, or as the circumstances may change, or as experience may demonstrate the necessity.

"Perhaps the most striking illustration of the principle here stated will be found among the judicial decisions which have held that the rights insured to private corporations by their charters, and the manner of their exercise, are subject to such new regulations as from time to time may be made by the state with a view to the public protection, health, and safety, and in order to guard properly the rights of other individuals and corporations. *Although these charters* are to be regarded as contracts, and the rights assured by them are inviolable, it does not follow that these rights are at once, by force of the charter contract, removed from the sphere of state regulation, and that the charter implies an undertaking, on the part of the state, *that in the same way in which their exercise is permissible at first*, and under the regulations then existing, and those only, may the corporators continue to exercise their rights while the artificial existence continues. The obligation of the contract by no means extends so far; but, on the contrary, the rights and privileges which come into existence under it are placed upon the same footing with other legal rights and privileges of the citizen, and subject in like manner to proper rules for their due regulation, protection and enjoyment."

To this clear, lucid statement of the rule deduced from the decisions, little can be added save to point out the various statutes that have been held to be legitimate exercises of the police power inherent in the several

states, which can not be taken from them, in whole or in part, and can not be exercised by congress.

This identical question was before this court in *Gorman v. Railroad*, 26 Mo. 441. That was an action to recover the value of three head of cattle killed by the railroad company. It was alleged they were killed at a point on the road where it ran through inclosed fields; that defendant had failed to erect and maintain fences as required by law; that the cattle were killed by reason of this failure. The company denied that it was subject to the law of 1853 requiring railroad companies to fence their roads where they passed over inclosed fields. It was conceded that *the company's charter antedated the act of 1853*, and moreover that *the legislature*, by the act of March 1, 1851, *had yielded the right to suspend or repeal its charter*. Sess. Acts, 1851, p. 270, sec. 4.

Judge Scott wrote the opinion of the court and conceded that the charter was a contract between the state and the company, but held, notwithstanding, that the corporation, like natural persons, was subject to those regulations which the state may prescribe for the good government of the community. He says: "Where such dangerous and powerful agents as steam engines are brought into use, there should be a power in the legislature to prescribe such reasonable regulations as will prevent injuries resulting from their employment. The foresight of man is not competent to the task of *prescribing in a charter all the regulations* which time may show to be necessary for the security of the interests of the people of the state against injuries caused by the introduction of new, powerful and dangerous agents for carrying on her intercourse and commerce. The charter must be taken subject to the understanding that in its operation affecting the interests of society *it will be, like individuals, liable to be controlled by such reasonable enactments as may be dictated by a sense of*

*what is required for the preservation of the persons, lives
and property of the people,* such enactments not contra-
vening the expressed or plainly implied provisions of
the charter."

He cited with approval the case of *Thorpe v. Rail-
road,* 27 Vermont, 140, in which Judge REDFIELD firmly
and ably sustained the power of the state legislature to
impose upon *existing railroad companies* the duty of
maintaining fences, and to construct and maintain cat-
tle guards, as clearly within the police power of the
state. The court also cited with approval the decision
of the supreme judicial court of Massachusetts in *Lyman
v. Railroad,* 4 Cushing, 288, in which "it was held that
a statute making the proprietors of railroads responsible
for *injuries* by *fire* communicated from their locomotive
engines *applied to railroads established before* as well as
since its passage, extends as well to estates, a part of
which was conveyed by the owner, as to those of which
a part is taken by authority of law for the purposes of
a railroad."

This statute of Massachusetts, enacted in 1840, was
the first to render the railroad companies liable for
fires put out by their locomotives. It is important to
note that the point was made in this first case that the
act did not apply to charters granted before its passage,
but the claim was denied, the court saying in its opin-
ion, that the act was "one of those general remedial
acts passed for the more effectual protection of prop-
erty against the hazards to which it has become sub-
ject by the introduction of the locomotive engine.
The right to use the parcel of land appropriated to a
railroad does not deprive the legislature of the power
to enact such regulations, and impose such liabilities
for injuries suffered from the mode of using the road,
as the occasion and circumstances may reasonably jus-
tify." This act of 1840 has again and again been held

valid, and enforced by the supreme court of Massachusetts, and its constitutionality never seriously questioned since the first case. *Hart v. Railroad*, 13 Met. 99; *Ross v. Railroad*, 6 Allen, 87; *Pierce v. Railroad*, 105 Mass. 199.

The Massachusetts act was adopted by the legislature of Maine in 1842, and sustained by the supreme court of Maine, in *Chapman v. Railroad*, 37 Me. 92, and in *Pratt v. Railroad*, 42 Me. 579, as binding equally upon corporations whose charters were granted prior to its enactment as those subsequently organized. The act was adopted by New Hampshire as early as 1850 and enforced by its highest court in *Hooksett v. Railroad*, 38 N. H. 242. It became the law of Iowa in 1873 (Code of 1873, sec. 1289), and received a most careful consideration by the supreme court of that state in *Rodemacher v. Railroad*, 41 Iowa, 297, and its constitutionality unanimously affirmed, as a valid exercise of the police power of the state, and applied as well to a company incorporated prior to the enactment as to one subsequently chartered. *Drady v. Railroad*, 57 Iowa, 393. The state of Connecticut also adopted the Massachusetts statute in effect in 1881. The constitutionality of the statute was challenged in *Grissell v. Railroad*, 9 Atl. Rep. 137, and fully sustained by the supreme court of that state. A statute similar in principle was upheld by the supreme court of Colorado in *Railroad v. De Busk*, 20 Pac. Rep. 752. In *Railroad v. McClelland*, 25 Ill. 140, an act requiring all railroads that were open for use to be fenced, and imposing a penalty for noncompliance, was considered, and it was held constitutional, the court saying "to hold otherwise, would be to say that the legislature might create an *imperium in imperio*."

These decisions all agree that subsequent acts imposing the duty to fence and affixing penalties for a

failure are clearly within the police power of the state, subject to which all laws are enacted in this state. And yet those acts imposed a burden and cost upon the roads not named in their charters. Those laws require the companies *at their own expense to erect and maintain* these fences along their roads. They are sustained on the ground that experience demonstrated that the operation of the roads with steam engines resulted in great loss to the adjoining owners in the destruction of their stock, lawfully running in their fields, and was liable to cause loss of life by wrecking trains.

The damage by fires set out by trains comes within the same reasoning. It had not been anticipated to what extent engines would destroy the crops and property along the road, but when it was demonstrated that it was a common occurrence, that the company had the right to run its trains at all times of day and night, and that the injured party was powerless often to show negligence, on account of his inability to show what particular train had set out the fire, or the particular cause of the fire, and because the owner was entirely innocent in the premises of any negligence, it was determined by the legislature that when one of two innocent parties must suffer, the one who operated the dangerous agency, should suffer the loss.

Notwithstanding the great weight of authority that such an act is within the police power of the state, the defendant challenges it here. We are, however, not impressed with its reasons to the contrary. If the state is powerless to protect its citizens from the ravages of fires set out by agencies created by itself, then it fails to meet one of the essentials of a good government. Certainly it fails in the protection of property. The argument of the defendant reduced to its last analysis is this: The state authorized the railroad companies to propel cars by steam. To generate steam, they are compelled

to use fire, therefore they can *lawfully use* fire, and as they are pursuing a lawful business, they are only liable for negligence in its operation; and when in a given case they can demonstrate they are guilty of no negligence, then they can not be made liable. To this the citizen answers, I also own my land lawfully. I have the right to grow my crops, and erect buildings on it at any place I choose. I did not set in motion any dangerous machinery. You say you are guiltless of negligence. It results then that the state which owes me protection to my property from others, has chartered an agency, which be it never so careful and cautious and prudent inevitably destroys my property, and yet denies me all redress. The state has no right to take or damage my property without just compensation.

But what the state can not do directly, it attempts to do indirectly, through the charters granted to railroads, if defendant's contention be true. When it was demonstrated that although the railroads exercised every precaution in the construction of their engines, the choice of their operatives, and clearing their rights of way of all combustibles, *still* fire was emitted from their engines, and the citizen's property burned, notwithstanding his efforts to extinguish it, and notwithstanding he had in no way contributed to setting it out, it is perfectly competent for the state to require the company who set out the fire to pay his damages. He is as much entitled to the protection from fire set out by engines, as he is against the killing of his stock by those engines. Neither of these remedies were foreseen as necessary when the charters were granted, but experience has shown both are now necessary for the protection of the citizen, and the organic law of the state prescribed before defendant obtained its charter that "the exercise of the police power of the state shall never be abridged, or so construed as to permit corpo-

rations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well-being of the state." Constitution of Missouri, art. 12, sec. 5.

Let it be conceded, for it is true, that prior to the enactment of section 2615, by the decisions of this and other courts, defendant was only liable for negligence in setting out fire; is it to be concluded that the legislature is powerless to enact laws which will give ample protection to citizens against fires? Most certainly not. Fire, as one of the most dangerous elements, has ever been the subject of legislative control.

It ought not to excite surprise among a people, the great body of whose laws had their origin in England, that those who set out fires which destroy the property of others, should be held absolutely responsible for them. Such was the ancient common law before any statutes were enacted. "If my fire, by misfortune burns the goods of another man, he shall have his action on the case against me. If a fire breaks out suddenly in my house, I not knowing it, and it burns my goods and also my neighbor's house, he shall have his action on the case against me. So if the fire is caused by a servant, or a guest or any person who entered the house with my consent; but otherwise if it is caused by a stranger who entered the house against my will." Rolle's Abridgment, Action on the Case, "B," tit., "Fire."

Under ordinary circumstances this was thought to be a harsh rule and it was not generally adopted by the courts of the several states, but the question we are discussing is not what the courts have generally regarded as the reasonable rule, but what is the power of the lawmaking power to adopt as a correct one. In considering it the dangerous character of fire must be kept in mind. Many laws have been sustained which

were enacted to prevent destruction of property by fire, which at first blush seemed arbitrary and infringing on natural right. Thus, the owner of a lot in a city may desire to build a frame or wooden building upon it, but the municipal corporation may establish fire limits and prevent the building of wooden buildings. *Charleston v. Reed*, 27 W. Va. 681; *King v. Davenport*, 98 Ill. 305; *Knoxville v. Bird*, 12 Lea (Tenn.), 121.

Counsel in his brief with great earnestness insists that "no law can be sustained as a police regulation which imposes a penalty or confers an action for doing that which has never been declared unlawful, and which on the contrary is made legal." But has not counsel gone too far in his assumption? Is there anything in defendant's charter that exonerates it from damage by fire it may set out, or permits it to destroy with impunity? If there is, would not the charter itself be liable to the charge of unconstitutionality? *Railroad v. Dick*, 9 Ind. 433. The right to use steam is granted, but it is granted subject to the right of the state to render the company liable for damages it may do in the use. The position of the defendant is that the law of the state permitting it to use steam in the operation of its trains is a protection from liability for fires set out by its engines, provided it is guilty of no negligence, and he invokes the principle that what the law authorizes can not be a nuisance although it may result in damages to individual rights or property.

That there are cases where corporations acting in the performance of a public duty, imposed upon them by the legislature, or in the exercise of a right conferred by law, and where persons appointed or authorized by law to perform a public duty or to do acts of a public character, are not responsible for consequential damages, if they act within their jurisdiction and are guilty of no negligence or want of care, is certainly true.

The cases sustaining this rule will generally be found to be those where municipal corporations were engaged in grading and improving public streets or highways, or where the act causing the injury was done by a corporation in the construction of its works upon property acquired under the power of eminent domain. *Transportation Co. v. Chicago*, 99 U. S. 635; *Uline v. Railroad*, 101 N. Y. 98; *Conklin v. Railroad*, 102 N. Y.107; Cooley's Const. Lim. [6 Ed.], 671.

But there is another rule of law, that has passed into a canon of construction and of great utility in these days when nearly all the business affairs of the country are carried on under corporate authority, and it is this, that in the construction of grants by the legislature, whether public or private, "only such powers and rights can be exercised under them as are clearly comprehended within the words of the act, or derived therefrom by necessary implication, regard being had to the object of the grant." *Carroll v. Campbell*, 108 Mo. 550; *Fanning v. Gregoire*, 16 How. (U. S.) 534; *Minturn v. Larue*, 23 How. (U. S.) 435. "And the rule is now established that the statutory authority which will justify an injury to private property and afford immunity for acts which would otherwise be a nuisance must be express, or must be a clear and unquestionable implication from powers expressly conferred, and it must appear that the legislature contemplated the doing of the very act which occasioned the injury." *Bohan v. Gas Light Co.*, 122 N. Y. 18; *Cogswell v. Railroad*, 103 N. Y. 10; *Railroad v. Fifth Baptist Church*, 108 U. S. 317; *Hill v. Managers of Asylum District*, L. R. 4 Q. B. Div. 433; s. c., L. R. 6 App. Cas. 193.

In the case last cited, Lord WATSON said, "where the terms of the statute *are not imperative*, but *permissive*, when it is left to the discretion of the persons

empowered to determine whether the general powers committed to them shall be put into execution or not, I think the fair inference is that the legislature intended that discretion to be exercised in strict conformity with private rights, and did not intend to confer license to commit nuisance in any place which might be selected."

It may be remarked that in the grant to defendant it is *nowhere imperatively required and compelled*, as argued by its counsel, to use steam. Its charter *permits* it "to convey persons by the force of steam, *or animals or by any mechanical power.*" To charge that the legislature ever intended by this grant to authorize defendants to destroy the property of the adjoining landowners by the use of fire, and deny them redress therefor according to well settled principles of the common law, as evidenced by numerous decisions, both in England and in the highest courts of this country, would be an imputation upon their sense of justice, and contrary to the ordinary rules of construction of such grants. No good reason can be shown, in my opinion, why the companies organized under this act should not be liable for the damage occasioned by their use of highly dangerous machinery; but most certainly the hands of all subsequent legislatures have not been so securely tied that they may not adopt a just and equitable rule in such cases, and not be charged with impairing the obligation of the state's contract with the railroad companies organized under the general law.

Although the decisions of this court only held landowners liable for fire set out by negligence, when this charter was granted, still there is nothing in the state or federal constitution that can restrict the state to those regulations, and *those only, existing at the time*, but it has the right, in order to guard the property of its citizens along these roads, to adopt new regulations

from time to time, as the necessity may require.  The state has, and can have, no higher function than the duty to provide for the safety of its citizens and their property.  All laws and all charters are passed subject to this duty, wherever it may arise.

Having come to the conclusion that this section in nowise impairs the obligation of the contract made in defendant's charter, we are brought to the next contention that defendant is deprived of the equal protection of the law.  That the statute is not open to this serious charge, we think is clear.  Defendant is brought into the same courts that are provided for other corporations and natural persons, upon the same process, and the plaintiff is required to make out his case according to the law of the land.

If it could be shown that this statute imposes a burden upon railroads from which it exempts others under the same or similar circumstances, then it would be open to the criticism that it deprived the railroads of the equal protection of the law; but if the circumstances are different, if no other person, natural or artificial, is authorized to condemn or purchase a narrow strip of land through the lands of others on its route, and to run trains propelled by steam over its road, at all times of day or night, and at all seasons, wet or dry, and using engines that scatter fire and burn property, although operated with a degree of care that amounts to "*faultlessness*," all for its own profit, then we assert that the statute is not obnoxious to the charge of denying the railroads protection it accords to others. So long as the state imposes this duty upon the only agency that has like powers, and creates similar hazards, it can not be charged with inequality or unjust discrimination.  This is a familiar rule in taxation where uniformity and equality are required by the

constitution. The statute applies to all railroads in this state,—a class of carriers operating one hundred and thirty-three railroads with a mileage of .six thousand, one hundred and twenty-five miles, in 1890. If it essayed to render only one road liable, it would be open to the objection; but, as it is, it might as well be said that a statute regulating the practice of medicine or peddlers is unconstitutional. This objection was overruled in *Railroad v. Emmons*, 13 U. S. Sup. Ct. Rep. 870; 149 U. S. 364.

The example cited by counsel as a similar case is that of a steamboat operated by steam. Nothing could well be more dissimilar in their surroundings than a railroad and a steamboat. The one is propelled upon the water, upon which the sparks from its smokestacks fall, and are instantly extinguished; the other runs along and beside fields full of grain, dry straw and other highly combustible material, upon which the sparks light and cinders are blown, at places and at times when it is almost impossible for the owner to be present and guard against the damages. It seems to us the example emphasizes the dangerous exception which railroads constitute to all other persons using steam as a means of transportation.

Finally, is it unconstitutional because it deprives defendant of its property "without due process of law," or in defiance of "the law of the land?" We accept Mr. Webster's definition of the law of the land: "By law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not, therefore, to be considered the law of the land. If this

were so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees and forfeitures, in all possible forms, would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void. Judges would sit to execute legislative judgments and decrees; not to declare the law, or to administer the justice of the country.''

We cheerfully concede that if this act comes within this definition, it is our sworn duty to declare it void and inoperative, notwithstanding the high respect· we have and owe to the legislative and executive branches of our government, which enacted and approved this act. Let us subject this statute to the test. At common law if a person used a highly dangerous machine, he must do so at the peril of the consequences if it caused injury to others. *Fletcher v. Rylands*, L. R. 1 Ex. 265; L. R. 3 H. L. 330 and the authorities referred to in Comyns' Dig., title, Action on the Case for Negligence, "A", 6. But when the legislature expressly authorized railroads in this state to operate and propel their cars by locomotive engines, it was ruled by our courts that the roads were only liable for negligence in setting out fire upon the premises of adjoining owners, in the absence of specific legislation to the contrary. And here lies the real contention of defendant in this case. It is that it is not competent for the legislature or lawmaking power to attach an absolute liability.

We have seen that at common law the liability for fire was absolute. In *Jones v. Railroad*, L. R. 3 Q. B. 733, BLACKBURN, J., said: "The general rule of common law is correctly given in *Fletcher v. Rylands*, Law Rep. 1 Ex. 265, 279 [Affirmed in House of Lords, L.

R. 3 H. L. 330] that when a man brings or uses a thing of a dangerous nature on his own land, he must keep it in at his peril; and is liable for the conse-quences if it escapes and does injury to his neighbor.'' Here the defendants were using a locomotive engine with no express parliamentary powers making lawful that use, and they are therefore at common law bound to keep the engines from doing injury, and if the sparks escape and cause damage, the defendants are liable for the consequences, though no *actual negligence* be shown on their part.''

It took acts of parliament 6 Anne, ch. 31 and 14 Geo. III., ch. 78, in England, to repeal this absolute liability for fire, accidentally set out on one's own premises and extending upon his adjoining proprietor. But if parliament might repeal, *it might also re-enact.*.

By the general statutes of Connecticut, page 489, section 6, one who kindles a fire on his own land is made liable for all damages it may do if it runs upon the land of another, and proof of negligence is not required. A similar statute was passed in Iowa, and sustained in *Conn v. May*, 36 Iowa, 241.

When the legislature passed the general railroad act, giving them the right to use steam, had it also annexed as a condition that the railroad should be absolutely liable for all damages they might cause by fire set out by them, would any one have questioned its power to do so? Had it been done, then would it not have been a valid exercise of its police power? No violation of the obligation of the contract could be charged in that case, and if it be a valid exercise of police power, all the authorities and defendant's counsel agree that the state is not restricted from asserting it by reason of the prior grant of the charter, for all charters are subject to it.

Does it then contravene natural right? Is it open

to the indictment preferred by defendant that it arbitrarily takes its property and confers it upon another without a hearing or consideration? We have seen that it was the ancient common law that the owner was liable for fire escaping from his own premises, whether negligent or not, and that different states in the union have re-enacted the old common law by which the owner is now absolutely liable for damage by fire put out on his own premises. Looking for the reason underlying the ancient rule of law, we find that it had its origin in the dangerous character of fire, and that whosoever put this dangerous agency in motion was rightfully required to see that it did no harm. That while it was an elementary principle that every individual is entitled to the undisturbed possession and lawful enjoyment of his own property, the mode of enjoyment was necessarily limited by the rights of others, otherwise it might result in the destruction of their rights altogether. Hence the maxim, *"Sic utere tuo non lædas alienum."* So that while it has been generally held that one is only liable for negligence in the prosecution of a lawful business nothing is more firmly settled than that a man can not erect a nuisance or employ dangerous agencies to the annoyance of an adjoining proprieter even for the purposes of a lawful trade. And it was an old common law maxim that where one of two innocent persons must suffer loss from an act done, it is just that it should fall on the one who occasioned the injury rather than upon the one who had no agency in producing the damage.

Counsel for defendant in his earnest denunciation of the act as violative of every principle of justice and indefensible as a police regulation, says: "But we are not aware that this principle of *'Sic utere, etc.,'* has ever been extended so far as to make a man liable for the lawful and careful use of his own property."

In *Hay v. Cohoes Company*, 2 Comstock, 159, the court of appeals of New York had this case before it: The defendant was a corporation chartered by the legislature and authorized to construct a canal. In the construction of the canal they resorted to blasting, and threw stone, gravel and slate upon the house and premises of plaintiff. He brought his action without alleging negligence. The defendants moved for a nonsuit, insisting that it was necessary both to aver and prove negligence and wantonness, and plaintiff had failed to do either. The trial court nonsuited plaintiff. The court of appeals reversed the case, saying, "the defendants had the right to dig the canal; *the plaintiff, the right to the undisturbed possession of his property*. If these rights conflict, the former must yield to the latter, as the more important of the two, since, upon grounds of public policy, it is better that one man should surrender a particular use of his land, than that another should be deprived of the beneficial use of his property altogether, which might be the consequence if the privilege of the former should be wholly unrestricted."

In *Tremain v. Same Company*, same volume, at page 163, the defendants offered to prove "that the work was done in the *best and most careful* manner." The common pleas court rejected it as irrelevant, as the declaration neither averred willfulness or *negligence*. The court of appeals sustained the common pleas court and held it was not necessary to charge or prove negligence to recover.

In *McAndrews v. Collerd*, 42 N. J. L. 189, these two cases in New York were reviewed and approved. In the New Jersey case the Delaware, Lackawana & Western Railroad Company was authorized by its charter to construct a tunnell through Bergen Hill. It contracted with McAndrews to do the work. The tunnell

was driven through rock, was begun in 1873 and finished in 1877. McAndrews constructed near the eastern end of the tunnel and within the limits of Jersey City a magazine for explosive materials which he used for blasting. In 1876, at night, the materials exploded, doing damage to property and among others injured Collerd's houses. In a suit by Collerd for damages it was held: "*First.* That the legislative authority to a private corporation, or an individual, to do a work· for its or his own profit, *does not include authority to use, at whatever hazard* to the persons or property of others, dangerous materials, even though they are necessary to the convenient prosecution of the work. *Second.* They will be liable for the injury, *although no negligence or want of skill in executing the work is proved, and* liable for actual damages, even though they show that they have done the work in the most careful manner."

In *Heeg v. Licht*, 80 N. Y. 579, the action was sustained "upon the ground that the manufacturing and storing of fireworks, and the use and keeping of materials of a dangerous and explosive character for that purpose constituted a private nuisance, for which the defend        able to respond in damages, without regard          whether he was chargeable with carelessness or negligence. The defendant had constructed a powder magazine upon his premises, *with the usual safeguards*, in which he kept stored a quantity of powder, which, without any apparent cause, exploded and caused the injury." The court says: "The fact that the magazine was liable to such a contingency, which could not be guarded against or averted by the greatest degree of care and vigilance, *evinces its dangerous character*, and might in some localities render it a private nuisance. *In such a case* the rule which exonerates a party engaged in a lawful business, when free from negligence, *has no application*."

It is significant that the argument employed by the court in that case to show the dangerous character of the magazine and for that reason to take it out of the rule that exonerates one in a lawful business from liability save for negligence, is *identically* the same used by defendant in this case to escape liability. It admits. that it uses fire in its engines and that the utmost care can not and does not prevent its destroying the property of adjoining proprietors, and yet insists, because it is engaged in a lawful business, it can only be made liable for negligence. See, also, *Bohan v. Gas Light Co.*, 122 N. Y. 18; *Powder Co. v. Tearney*, 131 Ill. 322. We think it is clear that upon the plainest principles of justice, it ought to be liable and that when experience demonstrated the dangerous character of the locomotive engine in setting out fire, it was not only the right but the manifest duty of the legislature to hold the railroads liable for fires set out by them without reference to whether they were guilty of negligence or not.

Nor do we think there is any force in the argument that by so doing their property is arbitrarily taken without right. The right to compel them to respond is based upon their use of a dangerous element, and by *their* destruction of adjoining proprietors' property. Moreover it is not done in an arbitrary manner. The plaintiff is required to show to a jury or court organized as in any other case that the road did set out the fire; that it did destroy his property; and the jury must, from the evidence, determine the amount of the damage. In no sense is it a finding without a hearing, nor are the essentials to a recovery based upon unreasonable or untenable grounds; in a word, *he is simply called upon to respond to a legal duty established by proofs.* The wrong done by the dangerous agency set in motion by the company and under its control is ample considera-

tion for the compensation it is required by the statute to make the owner whose property it destroys.

But were it without compensation it would not follow that the statute would be void. Many instances to the contrary were enumerated in *Railroad v. County Comm'rs*, 79 Maine, 386; 2 R'y & Corp. Law Journal, 210, in which it was held that the legislature might lawfully require railroads to fence their tracks, although the act was subsequent to the charter and although it imposed a burden and expense on the company not existing when it was incorporated. EMERY, Judge, says the wide extent of the police power "can be illustrated by instances of its actual exercise without direct compensation." Many of these instances are too familiar to need citation of authorities. He enumerates those cases in which licenses to manufacture liquor have been recalled, and the manufacturer prohibited after much expenditure by the licensees. *Beer Co.'s case*, 97 U. S. 33. Lotteries chartered for a consideration paid have been suppressed. *Stone's case*, 101 U. S. 814. The various inspection laws by which dealers are required to pay the inspection fees. Dealers using weights and measures must have them approved, and pay the approving officer. The blameless sufferer from a contagious disease is often compelled to leave home and friends, and bear his pain in some quarantine hospital; and his clothing destroyed, *all at his own expense*. The right of municipalities to destroy buildings to prevent spread of fire in an emergency. The owners of theatres, hotels and other public buildings are required at their own expense to provide fire escapes and more ample means of exit. Steamboats are subject to inspection, and must pay the fees therefor. Railroads are constantly having imposed upon them additional duties with reference to safety of persons and property—new inventions in brakes,

switches, blocking their switches, etc.   Pierce on Railroads, pp. 462, 463.

In this state, the action for damages in case of death was given after many of the old charters were granted, which must have greatly increased the cost of running the road, and yet Judge SCOTT says no one questioned that the act was constitutional.

II. But it is contended by appellant that the legislature never intended to make the fact of the injury anything more than *prima facie* evidence of negligence; that the circuit court erred in holding that proof of care and diligence on part of the defendant railroad would not relieve it of liability under the statute.

If this is all that was in the contemplation of the legislature it was a work of supererogation, because it has been the settled law of decision in this court since the determination in *Fitch v. Railroad*, 45 Mo. 322 in 1870, that, where it is proved that the property was destroyed by fire escaping from the defendant's engine, a *prima facie* case of negligence is made out; that the burden is then thrown on defendant by its evidence, to rebut the presumption of negligence by showing the absence of negligence.   *Coale v. Railroad*, 60 Mo. 227; *Clemens v. Railroad*, 53 Mo. 366; *Randle v. Railroad*, 65 Mo. 325; *Miller v. Railroad*, 90 Mo. 389.

In the light of this judicial history, and of the history of the act itself, we think the legislature meant more than this mere *prima facie* liability.   Section 2615 is a rescript of the Massachusetts act.   That act had been adopted in other New England states and in Iowa and a construction given it that rendered the railroad companies liable, independent of the question of negligence, for damages occasioned by fires set out by them. It is a familiar rule of construction in this state that when the legislature enacts a statute which is a transcript of a statute of another state that has received a

known judicial construction by the courts of that state,. it is deemed that our legislature adopted that construc- tion as an integral part of its act. *State ex rel. v. Macon Co. Ct.*, 41 Mo. 453; *Skouten v. Wood*, 57 Mo. 380; *West v. McMullen*, 112 Mo. 405; *Rodemacher v. Railroad*, 41 Iowa, 297; *Grissell v. Railroad*, 9 Atl. Rep. 137; s. c., 32 Am. & Eng. Railroad Cases, 349; *Railroad v. De Busk*, 20 Pac. Rep. 752; s. c., 38 Am. & Eng. Railroad Cases, 321; *Hooksett v. Railroad*, 38 N. H. 242; *Rowell v. Railroad*, 57 N. H. 132; *Lyman v. Railroad*, 4 Cush. 288.

We are confirmed in our views by the reasoning of the learned judge in *Small v. Railroad*, 50 Iowa, 338. He shows that in Iowa the court had not previ- ous to the statute held the fact of the fire *prima facie* evidence of *negligence*, and the language of the statute is made the turning point. Nothing, however, said in that case in our opinion, destroys the force of Judge DAY'S decision in *Rodemacher v. Railroad*, 41 Iowa, 297.

III. Appellant complains of a ruling of the court in excluding certain evidence. It offered to prove by Howard Blossom, an insurance agent, that trees, shrubs, plants and vines were by their inherent nature not susceptible of insurance, and it was impracticable from a business standpoint to insure such classes of property, and why it is so impracticable. Upon objection that this evidence was immaterial and irrelevant, the court excluded it, and defendant excepted.

It is not contended by defendant that "trees, shrubs, plants and vines," are not property, often of great value, and that as such it would not be included in the general term, "property," used in the statute, but they urge that such property is not insurable. Their offer was to show that the inherent nature of such property is uninsurable.

The act under consideration is not limited to any specific property. It is broad enough to include both real and personal property. The statute is an enabling act. By its terms the property becomes a subject of insurance. The mere fact that no person has as yet applied for insurance upon growing timber and ornamental shrubs would not meet the case. This character of property is of inherent value, adds greatly to the value of realty, and certainly is not more subject to change than ordinary personal property which is clearly insurable. That this class of property is subject to destruction by fire all must admit and no valid reason appears why it may not be insured.

We take it that it is not an open question under this statute, and no error was committed in declining to hear the evidence offered. The judge and jury would be as competent to respond to that question as any witness. Such property was held clearly within a similar statute in Maine, and insurable, in *Pratt v. Railroad*, 42 Maine, 579, a case much later than that cited by defendant from 37 Me. 92, and following *Hart v. Railroad*, 13 Metc. 99. Chief Justice BIGELOW, in *Ross v. Railroad*, 6 Allen, 87, pointed out the difficulties in which the supreme court of Maine had become involved by attempting to confine the right of recovery to permanent property, and repudiated any such limited construction. He maintained that the statute was broad enough to cover every species of property and the claim for indemnity was as strong in one as in the other. The evidence if permitted would have led to a distinction unauthorized by anything in the statute, which is remedial in its nature and not to be strictly construed against those for whose benefit it was enacted.

It becomes unnecessary to say more in regard to the point that the personal property in the house was

not insurable.   The personal property that was burned
was stored in the residence and barn and no reason is
given why it was not insurable.   The defendant's point
as to this in not sustained.

IV. On the trial defendant introduced witnesses
who testified that they lived in the neighborhood of the
Mathews home place; that it had been neglected for
years prior to August 9, 1887, and no care taken of it,
except to mow the meadow and lawn around the
house; that the garden, nursery and orchard had been
permitted to grow up in weeds, some of which were
two or three years old, and on the day of the fire were
very dry; that the place was a resort for boys who
frequented it to swim in the pond, and in the fall to
hunt; that the weeds and inflammable material at the
southeast corner near the nursery, ran right down to
the defendant's right of way.   At the conclusion of the
evidence defendant asked two instructions to the effect
that the conduct of plaintiff in permitting these weeds
to grow on his place as above testified, constituted such
contributory negligence as would prevent plaintiff's
recovery, or if such weeds augmented the loss, he
could only recover for so much of the injury as would
have followed had he not been negligent in that regard.
The circuit court declined to give either of said instruc-
tions and defendant complains of that ruling.

The instructions are predicated on the fact, that
the jury should *first* find that the fire was communi-
cated by defendant's engine to this grass or weeds, but
assumes that it was contributory negligence in plaintiff
to permit these weeds to grow upon his land in this
manner.   This question has often been before this
court beginning with *Fitch v. Railroad*, 45 Mo. 322,
and it has uniformly been ruled that it was not con-
tributory negligence in a farmer to permit dead and
dry grass to remain in his fields adjoining the right of

way, especially, as was said in *Patton v. Railroad*, 87
Mo. 117, "when there is no evidence   *   *   *   that
this is out of the usual course of husbandry." These
decisions of this court are amply supported by both
reason and authority in other states.

In *Railroad v. Medley*, 75 Va. 499, Judge WALLER
R. STAPLES delivered the opinion of the court. It
appeared in that case that the plaintiff's land was
covered with dry grass and broom sedge; that this
grass was of a highly combustible nature, and easily
ignited. The point was made that plaintiff was guilty
of contributory negligence, but the court held other-
wise, saying, "The legislature, in legalizing the use of
engines running through the country, scattering fire
and cinders on all sides, over lands in the vicinity of
the road, certainly did not intend to impose any addi-
tional burdens or duties upon the owners of such lands.
They are subject only to such risks as are necessarily
incidental to the proper and legitimate operation of the
road by those having charge of it. Any other rule
would impose upon property holders near the line of a
railroad the necessity of removing their grain, hay
and whatever is of a combustible nature to some dis-
tant point, not infrequently of changing the whole
course of husbandry—of incurring enormous expenses,
and of exercising ceaseless vigilance in order that the
company may negligently permit the accumulation of
dangerously inflammable matter upon its own lands,
liable at any moment to be ignited by fires from its
own locomotives. It has been well said that fire is an
extremely dangerous element, even when employed for
a lawful purpose. The exercise of due care and dili-
gence is imposed upon him who uses it, and sets it in
motion for his own advantage, *and not upon him who is
merely passive*, confining himself to lawful employment
and business in the conduct of his own affairs. There

are some few cases holding a contrary doctrine, but the great weight of authority is in conformity with the views here expressed. I refer particularly to an exhaustive discussion of the whole subject by Chief Justice DIXON in *Kellogg v. Chicago & North Western Railway Company*, 26 Wis. 223; and also to a very able opinion of Judge HAYMOND, in *Snyder et al. v. P. C. & St. L. Railway Co.*, 11 W. Va. 14; see *Salmon v. Del., Lack. & West. Railroad Co.*, 38 N. J. 5, and the same case reported in 39 N. J. 299."

In *Railroad v. Schultz*, 93 Pa. St. 341, the supreme court of Pennsylvania characterized the claim of defendant that plaintiff was guilty of contributory negligence because he permitted dry leaves, brushwood and other rubbish on his property, which could be readily fired by sparks from its locomotive, as *"an extraordinary proposition;"* assigning among other reasons, that "it is an attempt to impose upon property owners along the line of a railroad, duties unknown and unnecessary before the building of the road;" and, "if this proposition means anything, it means, that upon such property owners devolves the duty of guarding against the negligence of railroad companies and their servants, but this is simply absurd," and citing Judge AGNEW's opinion in *Railroad v. Hendrickson*, 80 Pa. St. 182. See, also, *Railroad v. Jones*, 86 Ind. 496; *Vaughan v. Railroad*, 3 H. & N. 750; *Railroad v. Hixon*, 79 Ind. 111.

It will be observed that defendant's own witnesses testified to the mowing of the grass and meadow, and the only accumulation was in the nursery, garden, vineyard and orchard. As remarked in *Patton's case, supra*, there was no evidence whatever, that it was not customary or even proper at times to let weeds grow. Certainly it can not be affirmed that weeds, even, are not often put to a most useful purpose, in mulching

and manuring. In any aspect of the case we think there was nothing showing contributory negligence by the plaintiff.

But there is another ground upon which this plea· should have been denied and that is, by virtue of section 2615 the defendant is made an insurer against fire set out by its engines and it is a familiar rule, that contributory negligence short of fraud does not furnish any defense to an action by the insured on his policy of insurance; and this was the view taken and enforced in *Rowell v. Railroad*, 57 N. H. 132.

V. In this connection we are called upon to consider the position taken by defendant in the fourth paragraph of its answer, which is in brief that at the time of the fire plaintiff was insured in certain insurance companies to the amount of $10,000; that after said fire said companies paid said loss of $10,000, wherefore defendant prays that the insurance money so paid to plaintiff by said insurance companies shall be applied *pro tanto* to the damages sued for in this case. The defendant is most clearly not entitled to any benefit of the insurance money which accrued to plaintiff by reason of defendant's own act in destroying the insured property.

In *Dillon v. Hunt*, 105 Mo. 154, this division held the rule as stated in 1 Sutherland on Damages [Ed. 1882], p. 242, to be correct, viz.: "There can be no abatement of damages on the principle of partial compensation received for the injury, where it comes from a collateral source, wholly independent of the defendant, and is as to him *res inter alios acta.* * * * The payment of such moneys not being procured by the defendant, and they not having been either paid or received to satisfy in whole or in part his liability, he can derive no advantage therefrom in mitigation of damages for which he is liable. * * * To permit a

reduction of damages on such a ground, would be to allow a wrongdoer to pay nothing, and take all the benefit of a policy of insurance without paying the premium." A similar conclusion had previously been reached in *Carroll v. Railroad*, 88 Mo. 239, to which our attention was not called at the time.

Although an insurer, defendant having itself destroyed the property, has no right to share the immunity afforded other insurers. Their relation as to this loss is entirely antagonistic to it. The defendant's liability is first and principal, that of the insurance companies secondary. Plaintiff and the insurance companies who paid his loss stand opposed to defendant, who was the cause of loss to both. There is no contractual relation or principle of subrogation that will enable defendant to require of them that they shall share their losses *pro.tanto* with it.

The statute points out the way by which it may protect itself against the loss. It confers on it an insurable interest in the property and only by availing itself of this right can it guard against those losses which occur by fires put out by it on the lands of adjoining owners. 2 May on Insurance, sec. 455; *Harding v. Townshend*, 43 Vt. 536; *Monticello v. Mollison*, 17 How. (U. S.) 152; *Hammond v. Schiff*, 6 S. E. Rep. 753; *Hart v. Railroad*, 13 Metc. 105; *Ross v. Railroad*, 6 Allen, 90.

VI. At the trial, defendant offered to prove that its right of way was a portion of the property described in plaintiff's petition; that when its railroad was built through plaintiff's premises in 1882, condemnation proceedings were instituted against plaintiff to which he was made a party; that before the commissioners appointed to assess plaintiff's damages among other items of damage caused by defendant's road, plaintiff

claimed as one, "damage of fire for all time to come." Defendant then offered to show by H. W. Hough and W. T. Essex, two of said commissioners, that they awarded plaintiff for his damages to all of his property $9,000, and for this "Home Place" they assessed the damage at $3,000; that in estimating the damage they took into consideration the danger to said property from accidental fire set out by engines on the railroad. That plaintiff and defendant finally agreed to abide the award, and the damages were accordingly paid. The court was requested to charge the jury in the second instruction prayed by defendant and refused by the court that if the commissioners did assess the damages and in so doing took into consideration the danger to plaintiff's property by accidental fire and said danger was also considered by plaintiff and defendant, then plaintiff can not recover, provided such proceedings and compromise were had prior to March 31, 1887.

When a part of a tract of land is taken for railroad purposes under condemnation proceedings, the jury or commissioners may properly take into consideration the risk from fire to the buildings, fences, timber or crops upon the remainder, in so far and to the extent *only* that *it depreciates* the value of the property, but compensation for a probable or future loss by fire is entirely too speculative and remote to be made the basis of damages. As said in *Railroad v. McGrew*, 104 Mo. 282 *loc. cit.* 294, "It would not be proper to estimate the possible damage from fires or injuries to persons. Neither may ever occur, and to take them into the estimate would be mere speculation. We think they may properly be considered, however, in so far as they tend to depreciate the value of the whole property, and to affect the proposed changes, but no further." Lewis on Eminent Domain, sec. 497; Mills on Eminent Domain, secs. 163, 166; *Railroad v.*

*McComb*, 60 Me. 290; *Pierce v. Railroad*, 105 Mass. 199; *Railroad v. McCloskey*, 110 Pa. St. 436.

The plaintiff's claim before the commissioners was damage from the risk of fire. In so far as that risk affected the value of his property not taken by depreciating it, it was a proper claim. There was nothing to show that it was unjustly extended to an estimate of damages that might accrue at some future time, or might never occur. The damages assessed were $3,000, and paid. After the assessment, then plaintiff held his property in its depreciated condition. How defendant can arrive at the conclusion that if this property in its depreciated condition is subsequently destroyed, plaintiff is not entitled to recover whatever damages that shall accrue from such subsequent destruction, we can not understand. The prior condemnation assessment has been made and settled. After that, plaintiff owns what is left absolutely, as he owned the whole before a portion was appropriated by the road. The subsequent damages constitute no part of the first. It is not double damages in any sense, as we view it. If the property is destroyed by negligence there can be no question of the liability of the company for burning it, nor is it material under section 2615, whether it was the result of negligence or pure accident. The statute operates upon the estate as it is when the fire occurs, and as we hold the statute valid, the company is liable. *Railroad v. McComb*, 60 Me. 290; *Adden v. Railroad*, 55 N. H. 413; *Grissell v. Railroad*, 9 Atl. Rep. 137; *Pierce v. Railroad*, 105 Mass. 199; *Lyman v. Railroad*, 4 Cush. 288.

We find no error in the judgment of the circuit court and accordingly affirm it. BLACK, C. J., concurs in holding section 2615 constitutional, but not as a police regulation, and in all respects as to other points. BRACE, BURGESS and MACFARLANE, JJ., concur. BARCLAY, J., in the result. SHERWOOD, J., dissents.